# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

VIRGIL CLYDE NELSON,

Defendant-Appellant.

UNPUBLISHED
September 13, 2018

No. 337268
Wayne Circuit Court
LC No. 16-005929-01-FH

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ALFRED JOSEPH NELSON,

Defendant-Appellant.

No. 337759
Wayne Circuit Court
LC No. 16-005692-01-FH

Before: SWARTZLE, P.J., and JANSEN and O'BRIEN, JJ.

PER CURIAM.

In Docket No. 337268, defendant Virgil Nelson appeals by right his jury convictions for assault with intent to do great bodily harm (AWIGBH), MCL 750.84, possession of firearm by a person convicted of a felony (felon-in-possession), MCL 750.224f, possession of a firearm during the commission of a felony (felony-firearm), second offense, MCL 750.227b, and assault with a dangerous weapon, MCL 750.82. Defendant Virgil was sentenced as a fourth-offense habitual offender, MCL 769.12, to 40 months to 15 years' imprisonment for his convictions of AWIGBH, felon-in-possession, and assault with a dangerous weapon, ordered to run concurrent to one another and consecutive to his sentence of five years' imprisonment for his conviction of felony-firearm, second offense. In Docket No. 337759, defendant Alfred Nelson appeals by right his jury convictions for AWIGBH, MCL 750.84, and assault with a dangerous weapon, MCL 750.82. Defendant Alfred was sentenced as a fourth-offense habitual offender, MCL

-1-

769.12, to 25 to 40 years' imprisonment for AWIGBH and 40 months to 15 years' imprisonment for assault with a dangerous weapon, ordered to run concurrently. These appeals were consolidated on administrative motion.[1] We affirm all convictions for both defendants. However, in Docket No. 337268, we remand for the administrative task of entering an amended judgment of sentenced for defendant Virgil to reflect his conviction of AWIGBH under the proper statute, MCL 750.84. In Docket No. 337759, we remand for the trial court to establish a factual basis for the $1,300 in costs imposed, or to alter that figure, if appropriate.

## I. FACTUAL BACKGROUND

On June 12, 2016, defendants were at a party at the Coleman Center in Romulus, Michigan, with their friend, Lenard Stewart. Abdul Hubbard and his brother, Eddie Hubbard, were at the same party. According to Abdul, when he left the party at around 2 a.m., he "got sucker punched" in the face by defendant Alfred. Afterwards, "[defendant] Virgil started hitting [him] in the head with a gun," and eventually both defendants and Stewart were hitting and kicking him. Abdul was unsure what prompted the attack. Abdul testified that he knew defendants well, and that "[y]ou might as well say" that he knew them practically his whole life. Eddie mostly confirmed Abdul's testimony, but he stated that he did not see a gun, although he heard people mention it.

Corporal Nicole Harris of the Romulus Police Department was called to the Coleman Center in response to a large fight on June 12, 2016, at 2:05 a.m. As Harris approached, "numerous people were fleeing on foot and in vehicles." She was flagged down by a female—later identified as Joann Deerman—"who pointed out a victim"—later identified as Abdul—and said that "he had been beaten up pretty bad." Deerman told officers that the perpetrators had a gun and left in a gold Yukon. Corporal Harris had seen a vehicle matching that description as she and her partner approached the scene, so she and her partner "immediately turned around and went to conduct a traffic stop." When the officers caught up to the gold Yukon, they conducted a traffic stop. Defendants and Stewart were in the car. Stewart fled after the stop, but was apprehended and taken into custody shortly afterwards. Both defendants fully complied and were taken into custody. Corporal Harris's partner found a gun covered in blood by the location of the traffic stop. Corporal Harris took swabs from the blood on the gun, and forensic scientists from the Michigan State Police (MSP) matched the DNA profile of the blood from the gun with Abdul's DNA. There was also blood on the interior of the gold Yukon that defendants were stopped in, and MSP forensic scientists later matched the DNA profile of that blood with Abdul's DNA.

After the stop, Corporal Harris returned to Abdul, but she was unable to interview him that night. However, Deerman was still with Abdul, so Harris took her statement. According to Corporal Harris, Deerman told her that there were "numerous people involved in the altercation," and she "indicated that a black male wearing a white shirt and blue jeans had a handgun, had the weapon and was striking [Abdul] in the head with it." Two of the suspects that Corporal Harris

---

[1] *People v Nelson*, unpublished order of the Court of Appeals, entered October 25, 2017 (Docket Nos. 337268; 337759).

and her partner apprehended were wearing white. Corporal Harris testified that she showed Deerman the three suspects in custody, and Deerman "indicated all three were involved in the altercation" and "that [defendant] Virgil Nelson was the individual who had the gun and who was striking the victim in the head with it."

Deerman testified at trial and confirmed that she was at the Coleman Center on June 12, 2016, and that she saw Abdul "getting hit with a gun." She also confirmed that, when police arrived, she told them that the people assaulting Abdul had left in a gold Yukon. Deerman further confirmed that, on the night of the beating, she identified the individuals that assaulted Abdul and the one that struck him with a gun. At trial, however, Deerman testified that she did not know the people that were involved in the fight, and she was unable to identify either defendant as having taken part in beating Abdul on June 12, 2016. Deerman admitted that she had been drinking the night of June 12, 2016, and that it was very late at night when she was asked to make the identification.

Stewart, who previously pleaded guilty to his involvement in the June 12, 2016 beating of Abdul, testified on behalf of defendants. Stewart testified that he was at the Coleman Center with defendants on June 12, 2016. According to Stewart, he went into the Coleman Center alone to use the restroom. He had a firearm on his person at the time, and brought it with him to the restroom. Stewart had the gun on his hip, hidden from view, and he did not tell anyone that he was carrying it. Stewart testified that after he came outside from using the bathroom, he saw Eddie and Abdul "being aggressive" and acting "a little feisty outside." Stewart described the brothers as "being loud and actually trying to start trouble." According to Stewart, he saw Eddie and Abdul "push a few people and cuss a few guys out." Stewart testified that he saw them push defendant Virgil and were "cussing him out." As Stewart continued to watch, he saw defendant Alfred and Abdul begin fighting and eventually stepped in because Abdul "was getting the best of [defendant] Alfred and he was basically on top of him punching him." Stewart testified that as for defendant Virgil, he "was basically defending his self [sic], just trying to keep Eddie off him cause Eddie was trying to grab him." Stewart later explained that everything started because Eddie was pushing defendant Virgil, and defendant Alfred "jumped in the middle and was trying to, you know, separate 'em." According to Stewart, when Abdul was on top of defendant Alfred, he was punching defendant Alfred in the face and head. Stewart testified that he took the gun that he was carrying and "hit Abdul over the head with" it while he was on top of defendant Alfred. Stewart identified the gun he used as the revolver that had been admitted into evidence. Stewart stated that he never saw defendant Virgil with a handgun. Stewart testified that after he hit Abdul, "[s]omeone said the police were coming," so he put the gun "back on the side of my hip and left" with defendants in defendant Virgil's gold Yukon.

The jury eventually convicted defendants as previously stated.

## II. DOCKET NO. 337268

In Docket No. 337268, defendant Virgil first argues that he was denied due process when the trial court denied his motion to suppress Deerman's "in-court" identification. We disagree. The decision to admit an in-court identification is reviewed for clear error. *People v Colon*, 233 Mich App 295, 304; 591 NW2d 692 (1998). "Clear error exists if the reviewing court is left with

a definite and firm conviction that a mistake has been made." *People v Johnson*, 466 Mich 491, 497-498; 647 NW2d 480 (2002).

Initially, we note that Deerman did not identify defendant Virgil in court, and, in fact, testified that she could not identify anyone involved in the June 12, 2016 assault. Thus, we will treat defendant Virgil's claim of error as challenging Deerman's *on-the-scene* identification of defendant Virgil, as was testified to by Corporal Harris.

A defendant can challenge an identification based on constitutional grounds if it was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [it amounts] to a denial of due process." *People v Winters*, 225 Mich App 718, 725; 571 NW2d 764 (1997). The fairness or suggestiveness of an identification procedure is evaluated in light of the totality of the circumstances to determine whether the procedure was so impermissibly suggestive that it led to a substantial likelihood of misidentification. *People v Williams*, 244 Mich App 533, 542; 624 NW2d 575 (2001).

Defendant Virgil's argument on appeal focuses entirely on case law related to photo-lineup identifications rather than on-the-scene identifications. This Court has noted that "[t]he concerns associated with such a stationhouse lineup are simply absent where the police promptly apprehend a suspect and return him to the scene of the crime for identification by the victim." *Winters*, 225 Mich App at 725. The *Winters* Court held that

> on-the-scene confrontations are reasonable, indeed indispensable, police practices because they permit the police to immediately decide whether there is a reasonable likelihood that the suspect is connected with the crime and subject to arrest, or merely an unfortunate victim of circumstance. Whatever the perceived problems of on-the-scene confrontations, it appears to us that prompt confrontations will, if anything, promote fairness by assuring greater reliability. [*Id*. at 728 (Citations omitted).]

Thus, the on-the-scene identification procedure, by itself, did not violate defendant Virgil's due process rights. And considering the totality of the circumstances, *Williams*, 244 Mich App at 542, the procedure used in this case was not so impermissibly suggestive so as to lead to misidentification. "[O]ne of the main benefits of prompt on-the-scene identifications is to obtain reliability in the apprehension of suspects, which insures both that the police have the actual perpetrator and that any improvidently detained individual can be immediately released." *People v Libbett*, 251 Mich App 353, 362; 650 NW2d 407 (2002).

Here, the on-the-scene identification was necessary for police to determine whether they apprehended potential suspects of the crime or "improvidently detained individuals" unconnected to the crime. Corporal Harris testified that when she arrived at the scene, Deerman told her that she saw the victim—later identified as Abdul—get beaten, that one of the men had a gun, and that the assailants left in a gold Yukon. Corporal Harris testified that she had seen a gold Yukon leaving the scene as officers arrived, so she and her partner turned the car around, and quickly identified and pulled over a gold Yukon. After stopping the vehicle, officers took the three individuals inside into custody, but had no way of ascertaining whether the individuals in custody were the assailants Deerman saw. To ensure that police had the right individuals in

custody, officers brought all three individuals back to Deerman for an on-the-scene identification. Corporal Harris testified that, while she was taking Deerman's statement, Deerman stated that one of the individuals struck Abdul in the head with a gun, and that this individual was wearing white. Because two of the three individuals in the vehicle were wearing white, officers also asked Deerman to identify which one she saw strike Abdul with the pistol. The three suspects were presented to Deerman, and she identified them as the individuals involved in the beating, and identified defendant Virgil as the one that struck Abdul with the pistol. There is simply nothing about this procedure that was impermissibly suggestive; instead, it was a reasonable attempt by officers to "decide whether there [was] a reasonable likelihood that the suspect[s] [were] connected with the crime and subject to arrest, or merely an unfortunate victim of circumstance." *Winters*, 225 Mich App at 728.

Defendant Virgil argues that this procedure was impermissibly suggestive because the police suggested to Deerman that the three individuals were the perpetrators in the assault by asking her to "identify who had the weapon." This, however, is not an accurate portrayal of the record. No one testified that officers "asked" Deerman to identify who had the weapon. Instead, the record reflects that officers showed Deerman the three individuals in custody, and she identified them as being involved in the assault and identified defendant Virgil as the one she saw beat Abdul with a gun. There is no evidence that the officers conveyed to Deerman that the three people in the on-the-scene lineup were involved in the assault, or even that they had been in the gold Yukon that Deerman saw leaving the scene.

We likewise reject defendant Virgil's argument that the trial court should have excluded Deerman's identification because eyewitness testimony has "inherent weakness" and results in a "likelihood of misidentification," as these are credibility questions that should be left to the jury. See *People v Lemmon*, 456 Mich 625, 646; 576 NW2d 129 (1998). Moreover, Deerman made the identification shortly after the assault at a time when the assailants' appearances were "still fresh in [her] mind," *Libbett*, 251 Mich App at 362, and the identification was necessary to ensure that police had the correct suspects in custody. *Winters*, 225 Mich App at 728. Also, as this Court has stated, "[w]hatever the perceived problems of on-the-scene confrontations, it appears to us that prompt confrontations will, if anything, promote fairness by assuring greater reliability." *Id*. Thus, any credibility concerns about Deerman's identification were properly left to the jury.

Defendant Virgil next argues that the trial court erred by instructing the jury on flight as consciousness of guilt. We disagree. "[A] trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006) (quotation marks and citation omitted). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Duncan*, 494 Mich 713, 722-723; 835 NW2d 399 (2013).

"A criminal defendant has the right to have a properly instructed jury consider the evidence against him." *People v Mills*, 450 Mich 61, 80; 537 NW2d 909(1995), mod 450 Mich 1212 (1995). "The Legislature has mandated that a trial court 'instruct the jury as to the law applicable to the case.' " *People v Rodriguez*, 463 Mich 466, 472; 620 NW2d 13 (2000), quoting MCL 768.29. It follows that "[a] trial court is *required* to give a requested instruction, except where the theory is not supported by evidence." *Mills*, 450 Mich at 81 (emphasis added). "[I]f

an applicable instruction was not given, the defendant bears the burden of establishing that the trial court's failure to give the requested instruction resulted in a miscarriage of justice." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002).

The instruction that defendant Virgil contests is M Crim JI 4.4, which the trial court gave to the jury as follows:

> There's been some evidence that the Defendant ran away after the alleged crime. This evidence does not prove guilt. A person may run or hide for innocent reasons such as panic, mistake, or fear.
>
> However, a person may also run or hide because of a consciousness of guilt. You must decide whether the evidence is true and if true whether it shows that the Defendant had a guilty state of mind. [Tr VI, 96-97.]

Defendant Virgil only contests whether the evidence supported giving this instruction, and we conclude that it clearly did. Every witness—including Stewart, who testified on behalf of defendants—testified that defendant Virgil, defendant Alfred, and Stewart left the scene once they heard that police were on the way. No one gave a reason for why defendants and Stewart left, so the *only* evidence was that defendants fled after finding out that the police were coming. On this record, we conclude the trial court did not abuse its discretion by leaving the question of whether this flight was evidence of guilt to the jury. See *People v Unger*, 278 Mich App 210, 226; 749 NW2d 272 (2008) ("We further acknowledge that it is always for the jury to determine whether evidence of flight occurred under such circumstances as to indicate guilt.").

Defendant Virgil argues that "[t]here was no evidence that [he] was 'hiding' or 'avoiding' the officers when they pulled him over in his vehicle." But this fast forwards past the relevant events; the instruction was proper based on evidence that defendants and Stewart stayed at the scene until they were told police were coming, and then left the scene after finding out. And because the evidence was that the defendants and Stewart left *in response to* hearing that the police were coming, it raised a question of fact for the jury of whether their flight was innocent or evidence of guilt.

Defendant Virgil next argues that the prosecution presented insufficient evidence to support his convictions for felon-in-possession and felony-firearm. We disagree. This Court reviews de novo a defendant's allegations regarding sufficiency of the evidence. *People v Herndon*, 246 Mich App 371, 415; 633 NW2d 376 (2001).

Possession is an element of both felon-in-possession and felony-firearm, and the prosecution must establish that element beyond a reasonable doubt in order to convict a defendant of either offense. See MLC 750.224f; *People v Akins*, 259 Mich App 545, 554; 675 NW2d 863 (2003). Defendant Virgil argues that the prosecution failed to present sufficient evidence to establish that he possessed a firearm, and thus his convictions for felon-in-possession and felony-firearm must be reversed.

"To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt."

*People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (citation and quotation marks omitted). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Gonzalez*, 468 Mich 636, 640–41; 664 NW2d 159 (2003) (citation and quotation marks omitted).

"It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). "All conflicts in the evidence must be resolved in favor of the prosecution." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "[An appellate court] must remember that the jury is the sole judge of the facts. It is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact." *People v Wolfe*, 440 Mich 508, 514–15; 489 NW2d 748 (1992) (alteration in original; citation and quotation marks omitted).

Here, resolving all conflicts in evidence in favor of the prosecution, there was sufficient evidence to conclude that defendant Virgil possessed a firearm. Abdul testified that defendant Virgil hit him in the head with the gun. Obviously, in order to strike Abdul in the head with the gun, defendant Virgil must have possessed it. This is direct evidence of defendant Virgil's possession of the gun. Despite that Abdul's testimony conflicted with Stewart's—who testified that he was the only person that possessed the gun on the night of the assault—it was the jury's responsibility to weigh the conflicting testimony and determine which was credible. The jury apparently found Stewart's testimony not credible, and concluded that defendant Virgil possessed the gun. Based on Abdul's testimony alone,[2] there was sufficient evidence to support that defendant Virgil possessed a firearm, which is the only element of felon-in-possession and felony-firearm that defendant Virgil contests.

Lastly, defendant Virgil challenges the trial court's response to the jury's question regarding the concept of "natural and probable consequence of the commission of the crime" as it related to the trial court's aiding and abetting instruction. The jury requested the trial court to give a "color interpretation" of what this part of the aiding-and-abetting instruction meant. Defendant requested the trial court to reread the mere presence instruction in response to the jury's request. The trial court declined to do so, and it ultimately chose not to directly answer the jury's request and only repeated its aiding-and-abetting instruction. Defendant argues that the trial court abused its discretion by failing to answer the jury's question because, essentially, the only way to respond to the question and clear jurors' confusion was to repeat the mere-presence instruction. We disagree.

---

[2] Additional evidence, besides Abdul's testimony, supports that defendant Virgil possessed a gun on June 12, 2016. Deerman testified that she told officers that she saw someone strike Abdul with a gun on June 12, 2016, and Corporal Harris testified that Deerman identified the man with the gun as defendant Virgil. Although Deerman could not identify defendant Virgil as having possessed the gun at trial, she admitted that she was able to identify the person that had the gun on the night of June 12, 2016.

A trial court's decision to not read a supplemental instruction to the jury is reviewed for an abuse of discretion. *People v Parker*, 230 Mich App 677, 681; 584 NW2d 753 (1998).

Fatal to defendant Virgil's argument, the jury's question related only to the trial court's instruction on aiding and abetting. Defendant Virgil does not contend otherwise, and actually concedes this on appeal. Thus, there is no question that the jury was not requesting additional instruction on mere presence.

In *Parker*, 230 Mich App at 681, this Court addressed an analogous situation, and concluded that the trial court's refusal to not give an instruction that was not requested by the jury was not an abuse of discretion. This Court succinctly resolved the issue as follows:

> Defendant first contends that the trial court erred in repeating for the jury its instructions regarding first- and second-degree murder, but failing to repeat the court's instructions regarding manslaughter and self-defense. We disagree. While the jury specifically requested supplemental instructions regarding first- and second-degree murder, no similar request was made with regard to the manslaughter and self-defense instructions. It is not an abuse of discretion for a trial court to fail to repeat instructions addressing areas not covered by a jury's specific request. *People v Bonham*, 182 Mich App 130, 134-135; 451 NW2d 530 (1989); *People v Darwall*, 82 Mich App 652, 663; 267 NW2d 472 (1978). [*Parker*, 230 Mich App at 681.]

Like in *Parker*, because the jury did not specifically request a supplemental instruction on mere presence, the trial court did not abuse its discretion by refusing to repeat that instruction.

### III. DOCKET NO. 337759

In Docket No. 337759, defendant Alfred first challenges the trial court's denial of his request for an eyewitness expert. "This Court reviews for abuse of discretion a trial court's decision whether to grant an indigent defendant's motion for the appointment of an expert witness." *People v Carnicom*, 272 Mich App 614, 616; 727 NW2d 399 (2006). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Duncan*, 494 Mich at 722-723.

In his motion for an eyewitness expert, defendant Alfred argued that "[t]he circumstances surrounding the alleged offense cast serious doubts on the prosecution witnesses' ability to identify [defendant Alfred] and to accurately recall the events that occurred" on the night of the assault. In support of his motion, defendant Alfred pointed out that the "identifications were made late at night, at a large gathering, and within the context of an altercation involving thirty (30) people." Defendant Alfred contended that "[a]n expert on eyewitness identification and memory recall [was] necessary in this case to explain how factors such as low visibility, alcohol consumption, fatigue, and the presence of multiple individuals in a high stress situation can severely diminish an eyewitness's ability to accurately identify a particular individual and recall their actions." After a hearing, the trial court denied defendant's motion, stating:

> The Court finds that the defendant has not made a showing that the expert's testimony would likely benefit him and has not explained why the Defendant

cannot proceed safely to trial without an expert in memory recall and eyewitness identification in a case involving the factors of low visibility, alcohol consumption, fatigue and the presence of multiple individuals in a high stress situation.

Based on its ruling, it is clear that the trial court addressed whether defendant was entitled to appointment of the expert under MCL 775.15 (stating that a defendant "shall make it appear to the satisfaction of the judge presiding . . . that there is a material witness . . . without whose testimony he cannot safely proceed to trial"). On appeal, both parties likewise address this issue under MCL 775.15. That statute, however, no longer governs whether an indigent defendant—such as defendant Alfred—is entitled to an expert witness. See *People v Kennedy*, ___ Mich ___, ___; ___ NW2d ___ (2018) (Docket No. 154445), p 17 ("We conclude that the Legislature did not intend MCL 775.15 to encompass requests by an indigent criminal defendant for the appointment of an expert at government expense, and we overrule *Jacobsen* and *Tanner* to the extent that they hold or suggest to the contrary."). Neither party filed supplemental briefing to analyze this issue under the framework laid out in *Kennedy*. See *id*. at ___; slip op at 19. But because our Supreme Court recently stated that " 'courts must give retroactive effect to new watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding,' " *People v Barnes*, ___ Mich ___, ___; ___ NW2d ___ (2018) (Docket No. 156060), p 3, quoting *Montgomery v Louisiana*, 577 US ___; 136 S Ct 718, 728; 193 L Ed 2d 599 (2016) (additional quotation marks and citation omitted), we address this issue under *Kennedy*'s proper framework.

In *Kennedy*, our Supreme Court held that to determine "whether an indigent criminal defendant is entitled to the appointment of an expert at government expense," the defendant " 'must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial.' " *Kennedy*, ___ Mich at ___; slip op at 19, quoting *Moore v Kemp*, 809 F2d 702, 712 (CA 11, 1987). Here, defendant Alfred failed to carry this burden. Defendant Alfred requested an eyewitness expert to testify why the witnesses' identifications should be questioned. But defendant Alfred fails to explain why he needed an expert to do this, and how denial of an eyewitness expert "would result in a fundamentally unfair trial." *Kennedy*, ___ Mich at ___; slip op at 19. Defendant Alfred could have questioned the witnesses' identifications during cross-examination, and then argued during closing that the identifications were not worthy of belief. Defendant Alfred has not explained why he needed an expert to question the witnesses' identifications when he could have brought the identifications into question through cross-examination. Thus, defendant Alfred failed to show a reasonable probability that denial of the assistance of an eyewitness expert would result in a fundamentally unfair trial.

Also, as noted by our Supreme Court, "questions of eyewitness identification, fading memories, witnesses' body language, and the like involve obvious human behavior from which jurors can make commonsense credibility determinations." *People v Kowalski*, 492 Mich 106, 143; 821 NW2d 14 (2012) (quotation marks omitted). The *Kowalski* Court stated that expert testimony is not needed to address this kind of common human behavior. *Id*. Thus, defendant Alfred did not need an expert to testify about why the eyewitnesses' identifications should be

questioned; instead, he could rely on jurors to make commonsense credibility determinations based on that evidence.[3]

Next, defendant Alfred argues that the trial court erred by denying his motion to produce the medical records of a brain injury that Abdul suffered in 2007. We disagree. A trial court's decision regarding discovery is reviewed for abuse of discretion. *People v Phillips*, 468 Mich 583, 587; 663 NW2d 463 (2003).[4]

In his motion to produce medical the records of Abdul's brain injury, defendant Alfred stated that Abdul had sustained a traumatic brain injury in a car accident in 2007, and has been seeing a doctor "to treat the long-term effects of the traumatic brain injury." Defendant Alfred contended that the "medical records relating to [Abdul's] traumatic brain injury . . . are relevant to the questions of his ability to observe and testify to the true facts of this case." Defendant Alfred requested the trial court "to order production of the records for the Court to review them, *in camera*, to determine whether they are relevant to his ability to truthfully and accurately testify, or whether they provide information that would allow the defense to engage in a particular attack on the witness's credibility." Defendant Alfred contended that "[t]his is not a fishing expedition" because "the effects of alcohol mixed with psychiatric medications are known in the medical community to inhibit a person's ability to accurately perceive and recall events." The trial court denied the motion, ruling that it was "a fishing expedition to see what may turn up."

In *People v Stanaway*, 446 Mich 643, 649; 521 NW2d 557 (1994), our Supreme Court addressed when a defendant's "constitutional right[] to obtain evidence necessary to his defense

---

[3] We also note that eyewitness identification was not an issue that affected defendant Alfred. It was undisputed that Alfred was involved in an altercation with Abdul; all witnesses, including defendants' witness Stewart, testified to that. Rather, the question was whether defendant Alfred was the aggressor in the altercation with Abdul, as Abdul and Eddie testified, or whether he was acting in self-defense, as Stewart testified. There was not a question of whether defendant Alfred was properly identified as fighting with Abdul.

[4] It appears rather obvious that defendant Alfred's second claim of error regards discovery, and it is well-established that discovery in criminal cases rests "in the sound discretion of the trial judge." *People v Maranian*, 359 Mich 361, 368; 102 NW2d 568 (1960). Nonetheless, defendant Alfred argues that we should review his second claim of error under a de novo standard, asserting that it is a constitutional claim. As best we can discern, defendant Alfred believes that his claim pertains to "a due process right" a defendant has to discover privileged information. However, our Supreme Court prescribed the process due to a criminal defendant attempting to discover privileged communications in *People v Stanaway*, 446 Mich 643, 649-650; 521 NW2d 557 (1994). Defendant Alfred does not contend that the process due provided in *Stanaway* is deficient; to the contrary, he argues that the trial court should have applied *Stanaway* but failed to properly do so. Thus, this is not a constitutional issue, but rather is a discovery issue reviewed for an abuse of discretion.

in a criminal trial" overcomes "the state's compelling interest in protecting" confidential information. The *Stanaway* Court resolved this dilemma as follows:

> We hold that where a defendant can establish a reasonable probability that the privileged records are likely to contain material information necessary to his defense, an in camera review of those records must be conducted to ascertain whether they contain evidence that is reasonably necessary, and therefore essential, to the defense. Only when the trial court finds such evidence, should it be provided to the defendant. [*Id*. at 649-650.[5]]

Based on this procedure, the *Stanaway* Court affirmed the trial court's "denial of an in camera review of the victim's counseling records," reasoning that "[t]he defendant's generalized assertion of a need to attack the credibility of his accuser did not establish the threshold showing of a reasonable probability that the records contain information material to his defense sufficient to overcome the various statutory privileges." *Id*. at 650. The *Stanaway* Court explained that a defendant must show "a good-faith belief, grounded in demonstrable fact," to establish "a reasonable probability that the records are likely to contain material information necessary to the defense." *Id*. at 677. The Court found that defendant failed to meet this burden because the defendant

> has not stated any specific articulable fact that would indicate that the requested confidential communications were necessary to a preparation of his defense. He has not stated a good-faith basis for believing that such statements were ever made or what the content might be and how it would favorably affect his case. The defendant merely alleged that the records may contain prior inconsistent statements. [*Id*. at 681.]

Here, Abdul's medical records regarding his brain injury were protected under MCL MCL 767.5a(2).[6] Thus, defendant Alfred was only entitled to have the trial court conduct an *in camera* review of Abdul's medical records if defendant Alfred could "establish a reasonable probability that the privileged records [were] likely to contain material information necessary to his defense." *Stanaway*, 446 Mich at 649.

In arguing for Abdul's medical records, defendant Alfred contended, without factual support, that the records were "relevant to the questions of his ability to observe and testify to the true facts of this case." Likewise, defendant Alfred speculated, without factual support, that "the effects of alcohol mixed with psychiatric medications are known in the medical community to

---

[5] *Stanaway*'s holding is now part of Michigan's rules for criminal procedure. See MCR 6.201(C)(2).

[6] MCL 767.5a(2) provides:

> Any communications . . . between physicians and their patients are hereby declared to be privileged and confidential when those communications were necessary to enable the . . . physicians to serve as such . . . physician.

-11-

inhibit a person's ability to accurately perceive and recall events." Like in *Stanaway*, these attempts to discover Abdul's medical records were "no more than a generalized assertion that the . . . records may contain evidence useful for impeachment on cross-examination." *Id*. at 681. While a traumatic brain injury may certainly affect a person's memory, defendant Alfred only speculated to this; he never produced any evidence "grounded in demonstrable fact" that Abdul's memory was, in fact, impaired as a result of his brain injury. *Id*. at 677. It was likewise speculation that Abdul's medication inhibited his ability to accurately perceive and recall events. Rather than specify a prescription that a person suffering a traumatic brain injury may take that interacts poorly with alcohol, defendant Alfred relied on unsubstantiated assertions that are allegedly "known in the medical community."

Also, defendant Alfred failed to state "any specific articulable fact that would indicate that the requested confidential communications were necessary to a preparation of his defense." *Id*. at 681. To the contrary, defendant Alfred did not state any defense that these medical records could have aided; he only argued that it may have made Abdul's testimony less credible. Mere allegations that the records may be used to bring into question a witness's credibility do not rise to the necessary "reasonable probability" of exculpatory evidence that a defendant must satisfy to warrant an *in camera* review. See *id*. (holding that the defendant had not met the "reasonable probability" burden by only alleging "that the records may contain prior inconsistent statements"). Defendant Alfred also failed to state what information he might find in Abdul's medical records, and was apparently just hoping to find *something*. Because defendant Alfred failed to establish a reasonable probability that the privileged records were likely to contain material information necessary to his defense, the trial court did not abuse its discretion by denying defendant Alfred's motion to discover Abdul's medical records related to his brain injury.

Lastly, defendant Alfred argues that the trial court erred by failing to establish a factual basis for its imposition of $1,300 in court costs. Because this issue is unpreserved, our review is for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

When imposing defendant Alfred's sentence, the trial court assessed "court costs of thirteen hundred dollars," but gave no further explanation.

"[C]ourts may impose costs in criminal cases only where such costs are authorized by statute." *People v Cunningham*, 496 Mich 145, 149; 852 NW2d 118, (2014). MCL 769.1k(1)(b)(*iii*) permits a trial court to impose costs as follows:

> (1) If a defendant enters a plea of guilty or nolo contendere or if the court determines after a hearing or trial that the defendant is guilty, both of the following apply at the time of the sentencing or at the time entry of judgment of guilt is deferred pursuant to statute or sentencing is delayed pursuant to statute:

> \* \* \*

> (b) The court may impose any or all of the following:

> \* \* \*

(*iii*) Until 36 months after the date the amendatory act that added subsection (7) is enacted into law, any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case, including, but not limited to, the following:

(A) Salaries and benefits for relevant court personnel.

(B) Goods and services necessary for the operation of the court.

(C) Necessary expenses for the operation and maintenance of court buildings and facilities.[7]

At the time defendant Alfred was sentenced, MCL 769.1k(1)(b)(*iii*) applied "to all fines, costs, and assessments ordered under MCL 769.1k" through October 17, 2017. *People v Konopka*, 309 Mich App 345, 357; 869 NW2d 651 (2015). Defendant Alfred was sentenced on February 24, 2017, so MCL 769.1k(1)(b)(*iii*) applied, and the trial court had statutory authority to assess defendant $1,300 in court costs so long as such costs were "reasonably related to the actual costs incurred." MCL 769.1k(1)(b)(*iii*); see *Konopka*, 309 Mich App at 357. In *Konopka*, this Court held that

although the costs imposed in this case need not be separately calculated, MCL 769.1k(1)(b)(*iii*), the trial court did not establish a factual basis, under the subsequently amended statute, for the . . . costs imposed. . . . [W]ithout a factual basis for the costs imposed, we cannot determine whether the costs imposed were reasonably related to the actual costs incurred by the trial court, as required by MCL 769.1k(1)(b)(*iii*). [*Konopka*, 309 Mich App at 359-360.]

Because defendant Alfred—like the defendant in *Konopka*—"specifically challenges the lack of reasoning for the costs imposed," remand is appropriate for the trial court "to establish a factual basis for the . . . costs imposed under MCL 769.1k(1)(b)(*iii*), or to alter that figure, if appropriate." *Id*. at 360.

On appeal, the prosecution concedes that the trial court was "supposed to make a record of the reasoning for the costs imposed," but summarily asserts that "the failure to provide this reasoning does not rise to the level of plain error, because defendant [Alfred] cannot show outcome-determinative prejudice." But defendant Alfred cannot establish prejudice because he does not know the trial court's reasoning for imposing the fine; without a factual basis for *why* the trial court imposed the fine, defendant Alfred cannot argue—and this Court cannot review—whether the fines were reasonable.

---

[7] This version of the statute was in effect when defendant Alfred was sentenced, but it has since been amended by 2017 PA 64. The amendment extended the applicability of MCL 769.1k(1)(b)(*iii*) to October 17, 2020. See MCL 769.1k(1)(b)(*iii*), as amended by 2017 PA 64.

The prosecution alternatively argues that the trial court's imposition of a $1,300 fine was reasonable because it was based on "the Third Circuit Court Criminal Case Cost Calculator." The prosecution attaches this Cost Calculator to its brief as an appendix, and admits that it was not included with the lower court record. Because this Cost Calculator was not included in the lower court record, we do not consider the prosecution's improper attempt to expand the record on appeal. See *People v Gingrich*, 307 Mich App 656, 659; 862 NW2d 432 (2014). Thus, we remand to the trial court to "to establish a factual basis for the . . . costs imposed under MCL 769.1k(1)(b)(*iii*), or to alter that figure, if appropriate." *Konopka*, 309 Mich App at 360.

In Docket No. 337268, we affirm defendant Virgil's convictions, but remand for the administrative task of amending the judgment of sentence to reflect defendant Virgil's conviction of AWIGBH under MCL 750.84. In Docket No. 337759, we affirm defendant Alfred's convictions, but remand for the trial court to establish a factual basis for the $1,300 in costs imposed, or to alter that figure, if appropriate. We do not retain jurisdiction in either case.

/s/ Brock A. Swartzle
/s/ Kathleen Jansen
/s/ Colleen A. O'Brien

-14-